UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN HALLE,<br>*on behalf of himself and all other employees similarly situated,*<br><br>*Plaintiffs,*<br><br>v.<br><br>WEST PENN ALLEGHENY HEALTH SYSTEM INC., THE WESTERN PENNSYLVANIA HEALTHCARE SYSTEM, INC., ALLE-KISKI MEDICAL CENTER, ALLEGHENY GENERAL HOSPITAL, ALLEGHENY GENERAL HOSPITAL – SUBURBAN CAMPUS, CANONSBURG GENERAL HOSPITAL, THE WESTERN PENNSYLVANIA HOSPITAL, THE WESTERN PENNSYLVANIA HOSPITAL – FORBES REGIONAL CAMPUS, ALLEGHENY MEDICAL PRACTICE NETWORK, ALLEGHENY SPECIALTY PRACTICE NETWORK, WEST PENN PHYSICIAN PRACTICE NETWORK, ALLEGHENY SIGNER RESEARCH INSTITTE, HIGHMARK, INC., ALLEGHENY HEALTH NETWORK, JOHN W. PAUL, BART METZGER, CHRISTOPHER T. OLIVIA, and JOHN LASKY.<br><br>*Defendants.* | COMPLAINT – COLLECTIVE ACTION AND DEMAND FOR JURY TRIAL<br><br><br><br>To Be Electronically Filed |

## NATURE OF CLAIM

1.    This is a proceeding for injunctive and declaratory relief and monetary damages to redress the deprivation of rights secured to plaintiff Steven Halle individually, as well as other employees similarly situated ("Collective Action Members"), under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq*. ("FLSA").

## JURISDICTION AND VENUE

2.    This court has jurisdiction pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343 (3)

and (4), conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights; pursuant to 28 U.S.C. § 1337, conferring jurisdiction of any civil action arising under any Act of Congress regulating interstate commerce; pursuant to the Declaratory Judgment Statute, 28 U.S.C. § 2201; pursuant to 29 U.S.C. §216 (b).

3. Venue is appropriate in the Western District of Pennsylvania since the allegations arose in this district and many of the Plaintiffs and Collective Action Members reside in this district.

## COLLECTIVE ACTION STATEMENT

4. The proposed collective action definition is as follows: All hourly employees whom the defendants suffered or permitted to work at least 40 hours in a workweek, and who, during those workweeks, were permitted to work during their unpaid meal periods, but who, because of the defendants' automatic meal break deduction policy, were not paid at the appropriate overtime rate for the time they worked during their unpaid meal periods, during the applicable statute of limitations.

5. The Collective Action Members who were employed at the defendants' Western Pennsylvania Hospital location are Subclass 1.

6. The number of putative class members is estimated to be approximately 13,500.

7. The questions of law and fact that are common to the collective action include the following:

a. Whether the defendants may lawfully suffer or permit their employees to work during their unpaid meal periods without ensuring that they are paid for such time.

b. Whether the defendants had actual or constructive knowledge that their employees were working during their unpaid meal periods.

c. Whether the defendants failed to ensure that their employees were paid for all the time that they worked during their unpaid meal periods.

## PARTIES

### A. Defendants

*West Penn Defendants*

8. Collectively, defendants West Penn Allegheny Health System, Inc., The Western Pennsylvania Healthcare System, Inc., Alle-Kiski Medical Center, Allegheny General Hospital, Allegheny General Hospital – Suburban Campus, Canonsburg General Hospital, The Western Pennsylvania Hospital, The Western Pennsylvania Hospital – Forbes Regional Campus, Allegheny Medical Practice Network, Allegheny Specialty Practice Network, West Penn Physician Practice Network, and Allegheny Singer Research Institute, (referred to collectively as "West Penn"), are related through, for example, common membership, governing bodies, trustees and/or officers and benefit plans.

9. The FLSA defines "employer" to include any person acting directly or indirectly in the interest of an employer in relation to an employee, and the FLSA defines "employee" as any person who is suffered or permitted to work. Under these statutory definitions, all the defendants are liable as employers under the FLSA.

10. The defendants are also jointly and severally liable as joint employers under 29

C.F.R. § 791.2 for the violations complained of herein.

11.     In particular, the regulations allow for joint and several liability if employers are not acting entirely independently of each other or if employers are not completely disassociated from each other, including when one employer controls, is controlled by, or is under common control with the other employer. Commonly, this arrangement of employers is referred to as a "joint employer" or "single employer."

12.     Courts look to the economic realities of the enterprise and the totality of the circumstances to determine whether there is a joint employer or single employer relationship.

13.     Here, the defendants are jointly and severally liable under the Department of Labor regulations and relevant case law because they act directly or indirectly in the interest of an employer, and because they are not acting entirely independently or are not completely disassociated from each other. The following facts set forth from example of the legal and factual basis supporting joint and several liability under the statute and regulations:

14.     Collectively, West Penn comprises a single, integrated enterprise, as it performs related activity through common control for a common business purpose.

15.     Collectively, West Penn is an enterprise engaged in the operation of a hospital and/or the care of the sick and is a healthcare consortium.

16.     West Penn operates at least five major hospitals and health care facilities and over 200 primary and specialty care facilities and centers and employs over 13,000 individuals throughout Western Pennsylvania.

17.     West Penn constitutes an integrated, comprehensive, consolidated health care delivery system, offering a wide range of services.

18.     For example, West Penn's website has boasted West Penn's ability to deliver

services as "an integrated team of physicians, nurses, and support professionals" and listed various awards and recognitions for its member institutions.

19.     West Penn has centralized supply chain management, financial, computer, payroll and health records systems that are integrated throughout its locations.

20.     Further, West Penn's labor relations and human resources are centrally organized and controlled, including defendants' employment of a Chief Human Resources Officer as part of the management team as well as the maintenance of system-wide policies.

21.     West Penn shares common management, including oversight and management by a senior executive team and board of directors.

22.     Upon information and belief, defendants have common ownership.

23.     At all relevant times, West Penn suffered or permitted Plaintiffs and Collective Action Members to perform work for it at its various health care locations.

24.     As such, defendants are the employer (single, joint or otherwise) of the Plaintiffs and Collective Action Members.

25.     These facts also support liability of West Penn based on principal/agency liability and as alter egos of each other. For example, as discussed herein, the component entities implemented the policies as required by defendants, due to the control defendants exercised on them, causing the wrongs at issue in this case.

26.     Defendants are also liable to plaintiffs and collective action members under a theory of joint venture. Defendants engage in a joint venture of operational control for providing healthcare services by entering an agreement, established through their conduct in sharing the profits and losses.

27.     Defendants jointly managed and controlled this venture as well as its

employees and assets.

28.     Based in part on the foregoing, the West Penn defendants, under 29 C.F.R. § 791.2, are also jointly and severally liable for the violations occurring at each of their locations.

***Highmark, Inc.***

29.     Defendant Highmark, Inc. is a successor to the West Penn defendants and therefore liable for the FLSA violations complained of herein.

30.     Highmark, Inc. is a Pennsylvania "nonprofit" corporation with its principal place of business located at 120 Fifth Avenue, Pittsburgh, Pennsylvania 15222.

31.     Highmark, Inc. is an enterprise engaged in the underwriting of various indemnity and managed care health insurance products for national, regional and individual accounts.

32.     Highmark Inc., is the largest health insurer in Western Pennsylvania; it employs well over 19,500 individuals and provides health, dental, vision and supplemental health products and services to 32.6 million customers.

33.     Highmark, Inc. and West Penn announced on June 28, 2011 their intention to pursue an "affiliation aimed at maintaining [West Penn] as high-quality choice for health care services to millions of Western Pennsylvanians."

34.     According to Highmark's Press Release, as part of the initial arrangement, Highmark immediately provided $50 million to WPAHS, "enabling the health system to sustain and strengthen its West Penn and Forbes Regional hospitals while assuring the continued delivery of quality medical services by the entire system."

35.     Highmark, Inc. is making a total financial commitment of up to $475 million over four years, including $75 million to fund scholarships for students attending medical schools affiliated with WPAHS.

36.     In April 2013, the Pennsylvania Department of Insurance approved Highmark's acquisition of the financially ailing West Penn Allegheny Health System ("WPAHS"). That decision, according to Highmark CEO William Winkenwerder Jr., makes Highmark one of the largest integrated health systems in the country.

*Allegheny Health Network*

37.     Following approval by the Pennsylvania Department of Insurance, Highmark announced the formation of Allegheny Health Network, the regions newest integrated delivery care system, to manage and operate WPAHS, and announced that the hospitals and providers of WPAHS would serve as a key component of Allegheny Health Network, naming John Paul as president and CEO of both Allegheny Health Network and WPAHS.

38.     Since that time, defendant Highmark, Inc. has continued to operate WPAHS through Allegheny Health Network.

*Highmark, Inc. and Allegheny Health Network are Liable as Successors to WPAHS*

39.     Highmark, Inc. and Allegheny Health Network are liable to Plaintiff and Collective Action Members under the doctrine of successor liability adopted by the Supreme Court and the Third Circuit for labor and employment related violations.

40.     Specifically, the doctrine of successor liability extends the liability of a predecessor entity to its successor for violations of remedial legislation including the FLSA.

41.     Courts find that successor liability exists when: (1) there is substantial continuity of business operations from the previous entity to its successor; (2) the successor

entity had notice of the pending lawsuit prior to acquiring the business or assets of the predecessor; and (3) the predecessor entity does not have the ability to provide adequate relief. The following facts set forth some examples of the legal and factual bases supporting successor liability.

### *Substantial Continuity of Business Operation*

42.    When Highmark announced that it would acquire WPAHS, it was reported by local media that Highmark, Inc. would assume West Penn's liabilities of about $1 billion including pension obligations of more than $250 million.

43.    David L. McClenan, chairman of the WPAHS board of directors, said at a June 28, 2011 press conference that "We share a common goal with Highmark to focus on the patient experience and improve health care and ensure choice for both those seeking care and those seeking employment in the health care sector in our regions." *See* Andrew Conte & Luis Fabregas, *West Penn Hospital Would Have Closed Without Highmark Deal*, PITTSBURGH TRIB.-REV., June 28, 2011.

44.    Working through Allegheny Health Network, Highmark, Inc. has continued to use the same West Penn facilities. According to Highmark's former President and CEO, Kenneth R. Melani, "They just need[ed] a little spit shining." *See* Conte & Fabregas.

45.    Through Allegheny Health Network, Highmark, Inc. also continues to use the same West Penn personnel to operate the healthcare system.

46.    As one example, Allegheny Health Network and Highmark, Inc. continue to employ Bart Metzger as Chief Human Resources Officer of WPAHS.

47. Through Allegheny Health Network, Highmark, Inc. continues to employ West Penn employees in the same jobs they had previously held and under the same working conditions.

48. Through Allegheny Health Network, Highmark, Inc. continues to use the same machinery and equipment used by the West Penn defendants to operate the healthcare system.

49. Through Allegheny Health Network, Highmark, Inc. continues to provide the same health care services that were provided by the West Penn defendants.

### Highmark, Inc. Has Notice of Pending Unpaid Wage Lawsuits Prior To Its Acquisition of West Penn.

50. *Kuznyetov v. West Penn Allegheny Health System, Inc.* Nos. 09-cv-379, 10-cv-948 (W.D. Pa.) ("the *Kuznyetsov* action") was pending in this District Court from April 2009 through December 2011, and an appeal related to that action was pending before the Third Circuit until September 2013. The West Penn defendants had two experienced law firms to defend them in that action, and the related appeal in which the plaintiffs and collective action members sought, among other things, unpaid wages for FLSA violations based on the West Penn defendants' illegal Meal Break Deduction Policy.

51. The *Kuznyetsov* action was well documented in the local print and television media. *See Channel 11 News, UPMC and West Penn Alleghany Accused of Cheating Workers Out of Pay* (WPXI television broadcast Apr. 1, 2009); *Channel 2 News, Nurses in Pittsburgh Contend Not Paid for Training or Work Done When Supposed to be on Meal Break* ( CBS television broadcast, Apr. 1, 2009; *Channel 11 News, UPMC and West Penn Allegheny Accused for Not Paying Employees for All Time Worked* (WPXI television broadcast, Apr. 2, 2009); *Channel 11 News, Medical Employees File Class Action Lawsuit Against UPMC and West Penn Allegheny*

(WPXI television broadcast Apr. 2, 2009); *Channel 4 News, UPMC and West Penn Alleghany Alleged to be Stealing Time from Employees* (ABC television broadcast Apr. 1, 2009); *Channel 4 News, Nurses Alleged UPMC and West Penn Allegheny Are Stealing Time From Employees* (ABC television broadcast Apr. 1, 2009); Bobby Kerlik, *100,000 Asked to Join Hospital Lawsui*t, PITTSBURGH TRIB.- REV., July 10, 2009; Bobby Kerlik, *Lawsuit Against UPMC, Mercy, West Penn Alleges Workers Weren't Fully Paid*, PITTSBURGH TRIB.- REV., July 10, 2009; Steve Twedt, *Pay Suit Against Hospital Seeks Plaintiffs*, PITTSBURGH POST-GAZETTE, July 10, 2009.

52.    In addition, Highmark itself was named as a defendant in *Foster v. West Penn Allegheny Health System*, No. 11-cv-1059 (W.D. Pa), an action that was related to the *Kuznyetsov* action, which also asserted collective claims under the FLSA based on similar violations by West Penn.

53.    Accordingly, Highmark, Inc. is on notice that the West Penn defendants have been involved in an actively litigated and well publicized class and collective action lawsuit regarding violations of the FLSA since 2009.

54.    The fact that Highmark, Inc. is on notice that the West Penn defendants are involved in FLSA class litigation is not surprising as Highmark, Inc. reportedly agreed to be liable for West Penn's other employee related obligations including pension obligations. According to Highmark, Inc. spokesman Michael Weinstein, "The simple answer to the question is yes, Highmark will assume responsibility for WPAHS debt/pension obligation," *See* Alex Nixon, *Highmark to Take on West Penn Debt in Deal,* PITTSBURGH TRIB.-REV., July 28, 2011.

55.     Given that all these facts occurred before Highmark, Inc. created Allegheny Health Network to manage and operate WPAHS, Allegheny Health Network was also on notice of these facts, from the time that it was formed to continue operating West Penn.

### West Penn Does Not Have The Ability To Provide Relief to Plaintiff and Collective Action Members For Wage And Hour Violations

56.     West Penn's financial struggles have been well publicized over the past decade.

57.     Most recently, West Penn lost $22 million in the financial quarter that ended March 2011. *See* Anna Matthews, *Insurer's Cost-Cut Plan: Buy Hospitals,* WALL ST. J., June 29, 2011.

58.     Highmark, Inc. has in the past provided financial support to help West Penn overcome its financial struggles. Specifically, Highmark, Inc., provided a $125 million subordinated loan to West Penn in 2000. In 2002, Highmark, Inc., provided a $42 million grant to West Penn.

59.     Still, West Penn's financial difficulties continued, necessitating intervention from Highmark for West Penn to stay in business. According to David L. McClenahan, WPAHS board chairman speaking of Highmark, "They are well-capitalized, and we're not, . . . that is putting it mildly." *See* Bill Toland & Steve Twedt, *Highmark, West Penn Cement Deal*, PITTSBURGH POST-GAZETTE, June 29, 2011.

60.     Before the acquisition of West Penn by Highmark, Moody's Investor Service had downgraded WPAHS's bond rating to B2 meaning highly speculative bordering on junk status, moderate unsafe investment, citing the organization's weak unrestricted cash position and lessening ability to absorb further declines in patient volume.

61.     For fiscal year 2011, WPAHS's financial deterioration continued with a $26.8 million operating loss.

62.     Highmark, on the other hand, is in a very good position, financially. Defendant Highmark, Inc. has reserves of at least $3.71 billion.

63.     Defendant Highmark, Inc.'s profits in 2010 surged 146 percent to $462.5 million. *See* Luis Fabregas, *Highmark Poised to Buy West Penn,* PITTSBURGH TRIB.-REV., June 25, 2011.

64.     In April 2013, Highmark was referred to by local media as West Penn's "$15 billion parent." Bill Toland and Steve Twedt, *Pennsylvania approves Highmark-West Penn Allegheny Health System merger*, PITTSBURGH POST-GAZETTE, April 30, 2013.

65.     David L. McClenahan, WPAHS's board chairman, reportedly said during a June 28, 2011 news conference that outlined the deal between Highmark, Inc. and West Penn that WPAHS wanted to remain independent but that was no longer an option financially. *See* Tolland and Twedt, *Highmark, West Penn Cement Deal*, *supra*.

66.     Had the deal with Highmark, Inc. not materialized, West Penn was preparing to close West Penn Hospital in the fall of 2011.

67.     Accordingly, the West Penn defendants do not have the financial ability to compensate the Plaintiff and Collective Action members for the FLSA violation in this matter.

68.     Consequently, Highmark, Inc. and Allegheny Health Network are liable for the violations complained of herein.

**Highmark, Inc. and Allegheny Health Network are Liable as Employers**

69.     In addition to being liable as successors, Highmark, Inc. and Allegheny Health Network are also liable as employers under the FLSA's statutory definition of employer for all violations that occurred after Highmark, Inc. and Allegheny Health Network took control of

West Penn, because Highmark, Inc. and Allegheny Health Network are now acting directly or indirectly in the interest of the employer of the employees of West Penn.

70.     Highmark, Inc. and Allegheny Health Network are also jointly and severally liable as joint employers under 29 C.F.R. § 791.2 for the violations complained of herein that occurred after Highmark, Inc., and Allegheny Health Network took control of West Penn.

71.     The following facts set forth from example of the legal and factual basis supporting joint and several liability under the statute and regulations:

72.     Collectively, WPAHS, Allegheny Health Network and Highmark, Inc. comprise a single, integrated enterprise, as it performs related activity through common control for a common business purpose.

73.     Collectively, WPAHS, Allegheny Health Network and Highmark, Inc. constitute an enterprise engaged in the operation of a hospital and/or the care of the sick and is a healthcare consortium.

74.     Through WPAHS, Highmark, Inc. and Allegheny Health Network operate at least five major hospitals and health care facilities and over 200 primary and specialty care facilities and centers and employs over 17,000 employees throughout Western Pennsylvania.

75.     Collectively, WPAHS, Alleghany Health Network, and Highmark, Inc. constitute an integrated, comprehensive, consolidated health care delivery system, offering a wide range of services.

76.     Further, Allegheny Health Network's labor relations and human resources are centrally organized and controlled, including defendants' employment of a Chief Human Resources Officer as part of the management team as well as the maintenance of system-wide policies.

77.     WPAHS and Allegheny Health Network share common management, including oversight and management by a senior executive team and board of directors.

78.     For example, WPAHS and Allegheny Health Network share the same President and CEO, John W. Paul.

79.     As a further example, Jacqueline Bauer is both the Chief Administrative Officer and Secretary of Allegheny Health Network and the Chief General Counsel of WPAHS.

80.     Upon information and belief, Highmark, Inc., Allegheny Health Network, and WPAHS have common ownership.

81.     At all relevant times since Highmark and Allegheny Health Network took control of WPAHS, Highmark, Inc. and Allegheny Health Network suffered or permitted Plaintiff and Collective Action Members to perform work for it at its various health care locations.

82.     As such, Highmark, Inc. and Allegheny Health Network are the employer (single, joint or otherwise) of the Plaintiffs and Collective Action Members.

83.     These facts also support liability of Highmark, Inc. and Allegheny Health Network based on principal/agency liability and as alter egos of each other and of WPAHS and its component entities. For example, as discussed herein, the component entities implemented the policies as required by Highmark, Inc. and Allegheny Health Network, due to the control Highmark, Inc. and Allegheny Health Network exercised on them, causing the wrongs at issue in this case.

84.     Highmark, Inc. and Allegheny Health Network are also liable to plaintiffs and collective action members under a theory of joint venture. Highmark, Inc. and Allegheny Health Network engage in a joint venture of operational control for providing healthcare

services by entering an agreement, established through their conduct in sharing the profits and losses.

85.     Highmark, Inc. and Allegheny Health Network jointly managed and controlled this venture as well as its employees and assets.

86.     Based in part on the foregoing, the defendants, under 29 C.F.R. § 791.2, are also jointly and severally liable for the violations occurring at each of its locations.

87.     Based on Highmark, Inc. and Allegheny Health Network's liability as successors to the West Penn defendants' violations of the FLSA, and as employers themselves, West Penn, Allegheny Health Network, and Highmark, Inc., will be referred to collectively as "defendants."

**John W. Paul**

88.     John W. Paul is the President and CEO of Allegheny Health Network and the President and CEO of WPAHS. He has officially held that position since April 2013, but has, by the defendants' own admission, "successfully led a dedicated integrated delivery system core team at Highmark" since at least November 2011, when Highmark began taking control of WPAHS.

89.     Mr. Paul's responsibilities include actively managing Allegheny Health Network and WPAHS.

90.     Mr. Paul has the authority to, and does, make decisions that concern the policies defendants adopt and the implementation of those policies.

91.     Mr. Paul has the authority to, and does, make decisions that concern defendants' operations, including functions related to employment, human resources, training, payroll, and benefits.

92.     Due in part to his role as President, Mr. Paul is actively involved in creating or maintaining the illegal policies complained of in this case since November 2011.

93.     Due in part to his role as President, Mr. Paul actively advises defendants' agents on the enforcement of the illegal policies complained of in this case.

94.     Due in part to his role as President, Mr. Paul actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA.

95.     In concert with others, Mr. Paul has the authority to, and does, make decisions that concern the reviewing and counseling of defendants regarding employment decisions, including hiring and firing of Plaintiffs.

96.     In concert with others, Mr. Paul has the authority to, and does, make decisions that concern employees' schedules, hours and standard benefit levels.

97.     Mr. Paul has the authority to, and does, make decisions that concern standard pay scales.

98.     Mr. Paul has the authority to, and does, make decisions that concern defendants' human resources policies, the resolution issues and disputes regarding policies and their applications, the counsel locations receive regarding human resources issues, and communications with employees about human resources issues and policies.

99.     Mr. Paul has the authority to, and does, make decisions that concern defendants' employment and human resources records, including the systems for keeping and maintaining those records.

100.    Mr. Paul has the authority to, and does, make decisions that concern training and education functions across WPAHS and Allegheny Health Network.

101.    Mr. Paul has the authority to, and does, make decisions that concern the type

and scope of training employees must attend as well as any compensation they receive for attending training.

102.    Mr. Paul has the authority to, and does, make decisions that concern payroll functions across WPAHS and Allegheny Health Network.

103.    Mr. Paul has the authority to, and does, make decisions that concern the system for keeping and maintaining employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information including their payroll checks.

104.    Mr. Paul has the authority to, and does, make decisions that concern benefit plans across WPAHS and Allegheny Health Network.

105.    Because Mr. Paul has authority to hire or fire employees, provide and direct support regarding human resources issues, including the hiring and firing of Plaintiffs, and control the drafting and enforcement of the policies which govern the hiring and firing of employees, Mr. Paul has the power to hire and fire employees.

106.    Because Mr. Paul has authority to establish work schedules and/or conditions of employment, provide and direct support regarding human resources issues, including work schedules and/or conditions of employment, control the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, establish the type and scope of training employees receive, and administer employees' benefit programs, including standard benefit levels and the type and scope of benefits available to employees, Mr. Paul supervises and controls employees' work schedules and/or conditions of employment.

107.    Because Mr. Paul has authority to establish employees' rate and method of

payment and centrally control payroll functions, including standard pay scales, the provision of payroll information, and the timing of payment, Mr. Paul determines the rate and method of employees' payment.

108.    Because Mr. Paul has authority with respect to defendants' centralized records, including a database regarding employees' employment records, and systems for keeping and maintaining payroll, benefits, and other employment-related records, Mr. Paul maintains employees' employment records.

109.    Because Mr. Paul provides day-to-day support regarding human resources issues, including employees' work schedules and/or conditions of employment, controls the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, and administers employees' benefit programs, he is affirmatively, directly, and actively involved in operations of the defendants' business functions, particularly in regards to the employment of Plaintiffs.

110.    Because Mr. Paul is actively involved in creating and maintaining the illegal policies complained of in this case, actively advises defendants' agents on the enforcement of the illegal policies complained of in this case and actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA, he actively participates in the violations complained of in this action.

111.    Based upon the foregoing, Mr. Paul is liable to Plaintiffs because of his active role in operating the business, his status as an employer, and/or according to federal law.

*Bart Metzger*

112.    Bart Metzger is the Chief Human Resources Officer at WPAHS. He has held that position since approximately August 31, 2010.

113.    Bart Metzger is responsible for providing direction and control over human resources and is authorized to direct all aspects of human resources functions across WPAHS.

114.    Bart Metzger is actively involved in reviewing and counseling defendants regarding employment decisions, including the hiring and firing of Plaintiff and Collective Action Members.

115.    Bart Metzger is actively involved in decisions that set employees' schedules and hours.

116.    Bart Metzger is actively involved in the determination and drafting of human resources policies, the resolution of issues and disputes regarding policies and their application, the counseling locations receive regarding human resources issues, and communications with employees about human resources issues and policies.

117.    Bart Metzger, is actively involved in West Penn defendants' employment and human resources records, including the systems for keeping and maintaining those records.

118.    Bart Metzger has ultimate authority over the creation of all human resource policies, subject only to the authority of the CEO.

119.    Because Bart Metzger has authority to hire or fire employees, provide and direct support regarding human resources issues, including the hiring and firing of employees, and control the drafting and enforcement of the policies which govern the hiring and firing of employees, Bart Metzger has the power to hire and fire employees.

120.    Because Bart Metzger has authority to establish work schedules and/or conditions of employment, provide and direct support regarding human resources issues, including work schedules and/or conditions of employment, and control the drafting and enforcement of the policies which govern employees' schedules and/or conditions of

employment, Bart Metzger supervises and controls employees' work schedules and/or conditions of employment.

121.   Because Bart Metzger has authority with respect to West Penn defendants' centralized records, including a database regarding employees' employment records, Bart Metzger maintains employees' employment records.

122.   Because Bart Metzger provides day-to-day support regarding human resources issues, including employees' work schedules and/or conditions of employment, and controls the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, he is affirmatively, directly, and actively involved in operations of West Penn defendants' business functions, particularly in regards to the employment of Plaintiff and Collective Action Members.

123.   Due in part to his role of overseeing human resources, and training and education, Bart Metzger is actively involved in the creation of the illegal Policy complained of in this case.

124.   Due in part to his role of overseeing human resources, and training and education, Bart Metzger actively advises defendants' agents on the enforcement of the illegal Policy complained of in this case.

125.   Due in part to his role of overseeing human resources, and training and education, Bart Metzger actively ensures West Penn defendants' compliance or noncompliance with federal law, including the requirements of the FLSA.

126.   Bart Metzger is aware that West Penn's Meal Break Deduction Policy permits employees to work during their meal breaks, and that West Penn does not prevent employees

from working during their meal breaks because the needs of the hospital dictate that employees need to be available to work at a moments' notice.

127.   Among other things, Bart Metzger knows that West Penn does not track the time that employees are working during their meal breaks, and that if employees do not report working during their meal break to the timekeeper, then they will not be paid.

128.   Among other things, Bart Metzger is aware that West Penn made no effort to determine how often employees are working during their meal breaks.

129.   Among other things, Bart Metzger is also aware that West Penn made little effort to train employees on what constitutes compensable time and has not conducted any follow up or refresher training with employees to determine whether they were being paid for all the hours that West Penn suffers or permits its employees to work.

130.   Among other things, Bart Metzger is aware that West Penn's Meal Break Deduction Policy has resulted in widespread failure to compensate employees for the work they do for West Penn during their meal breaks.

131.   Because Bart Metzger is actively involved in the implementation of the illegal Policy complained of in this case, actively advised West Penn defendants' agents on the enforcement of the illegal Policy complained of in this case and actively ensured West Penn defendants' compliance or non-compliance with federal law, including the requirements of the FLSA, Bart Metzger actively participated in the violations complained of in this action.

132.   Based upon the foregoing, Bart Metzger is liable to Plaintiff and Collective Action Members because of his active role in operating the business, his role in the violations complained of in this action, his status as an employer, and/or otherwise according to federal law.

*Christopher T. Olivia*

133.    Christopher T. Olivia was the President and CEO of WPAHS from 2008 to June 2011.

134.    Mr. Olivia's responsibilities included actively managing WPAHS.

135.    Mr. Olivia had the authority to, and did, make decisions that concern the policies defendants adopt and the implementation of those policies.

136.    Mr. Olivia had the authority to, and did, make decisions that concern defendants' operations, including functions related to employment, human resources, training, payroll, and benefits.

137.    Due in part to his role as President and CEO, Mr. Olivia was actively involved in creating or maintaining the illegal policies complained of in this case from 2008 to June 2011.

138.    Due in part to his role as President and CEO, Mr. Olivia actively advised defendants' agents on the enforcement of the illegal policies complained of in this case.

139.    Due in part to his role as President and CEO, Mr. Olivia actively ensured defendants' compliance or non-compliance with federal law, including the requirements of the FLSA.

140.    In concert with others, Mr. Olivia had the authority to, and did, make decisions that concern the reviewing and counseling of defendants regarding employment decisions, including hiring and firing of Plaintiff and Collective Action Members.

141.    In concert with others, Mr. Olivia had the authority to, and did, make decisions that concern employees' schedules, hours and standard benefit levels.

142.    Mr. Olivia had the authority to, and did, make decisions that concern standard

pay scales.

143.    Mr. Olivia had the authority to, and did, make decisions that concern defendants' human resources policies, the resolution issues and disputes regarding policies and their applications, the counsel locations receive regarding human resources issues, and communications with employees about human resources issues and policies.

144.    Mr. Olivia had the authority to, and did, make decisions that concern defendants' employment and human resources records, including the systems for keeping and maintaining those records.

145.    Mr. Olivia had the authority to, and did, make decisions that concern training and education functions across WPAHS.

146.    Mr. Olivia had the authority to, and did, make decisions that concern the type and scope of training employees must attend as well as any compensation they receive for attending training.

147.    Mr. Olivia had the authority to, and did, make decisions that concern payroll functions across WPAHS.

148.    Mr. Olivia had the authority to, and did, make decisions that concern the system for keeping and maintaining employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information including their payroll checks.

149.    Mr. Olivia had the authority to, and did, make decisions that concern benefit plans across WPAHS.

150.    Because Mr. Olivia had authority to hire or fire employees, provide and direct support regarding human resources issues, including the hiring and firing of Plaintiff and

Collective Action Members, and control the drafting and enforcement of the policies which govern the hiring and firing of employees, Mr. Olivia had the power to hire and fire employees.

151.   Because Mr. Olivia had authority to establish work schedules and/or conditions of employment, provide and direct support regarding human resources issues, including work schedules and/or conditions of employment, control the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, establish the type and scope of training employees receive, and administer employees' benefit programs, including standard benefit levels and the type and scope of benefits available to employees, Mr. Olivia supervised and controlled employees' work schedules and/or conditions of employment.

152.   Because Mr. Olivia had authority to establish employees' rate and method of payment and centrally control payroll functions, including standard pay scales, the provision of payroll information, and the timing of payment, Mr. Olivia determined the rate and method of employees' payment.

153.   Because Mr. Olivia had authority with respect to defendants' centralized records, including a database regarding employees' employment records, and systems for keeping and maintaining payroll, benefits, and other employment-related records, Mr. Olivia maintained employees' employment records.

154.   Because Mr. Olivia provided day-to-day support regarding human resources issues, including employees' work schedules and/or conditions of employment, controls the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, and administers employees' benefit programs, he was

affirmatively, directly, and actively involved in operations of the defendants' business functions, particularly in regards to the employment of Plaintiffs.

155.   Because Mr. Olivia was actively involved in creating and maintaining the illegal policies complained of in this case, actively advised defendants' agents on the enforcement of the illegal policies complained of in this case and actively ensured defendants' compliance or non-compliance with federal law, including the requirements of the FLSA, he actively participated in the violations complained of in this action.

156.   Based upon the foregoing, Mr. Olivia is liable to Plaintiffs because of his active role in operating the business, his status as an employer, and/or according to federal law.

*John Lasky*

157.   John Lasky was the Chief Human Resources Officer at WPAHS from April 1, 2007 through August 31, 2010.

158.   By his own admission, John Lasky was responsible for providing direction and control over human resources and was authorized to direct all aspects of human resources functions across WPAHS.

159.   John Lasky was actively involved in reviewing and counseling defendants regarding employment decisions, including the hiring and firing of Plaintiff and Collective Action Members. For example, by his own admission, defendant Lasky's job duties included managing "all people processes with the exception of payroll" including, specifically, "hiring, developing, promoting, . . . disciplining, and retiring employees."

160.   John Lasky was actively involved in decisions that set employees' schedules and hours.

161.   John Lasky was actively involved in the determination and drafting of human resources policies, the resolution of issues and disputes regarding policies and their application, the counseling locations receive regarding human resources issues, and communications with employees about human resources issues and policies. For example, the human resources directors as each of West Penn's hospital locations reported directly to defendant Lasky and discussed their human resources policies with him. By his own admission, defendant Lasky functionally led all human resources activities at West Penn.

162.   Moreover, by his own admission, defendant Lasky saw it as his job to "communicate directly with employees to engage them in the process" of following all human resources policies, and believed that his job, along with the rest of the executive team, was to be "on the ground" at the various hospital locations on a "very frequent" basis, having forums with employees.

163.   John Lasky was actively involved in West Penn defendants' employment and human resources records, including the systems for keeping and maintaining those records.

164.   John Lasky had ultimate authority over the creation of all human resource policies, subject only to the authority of the CEO.

165.   Because John Lasky had authority to hire or fire employees, provide and direct support regarding human resources issues, including the hiring and firing of employees, and control the drafting and enforcement of the policies which govern the hiring and firing of employees, John Lasky had the power to hire and fire employees.

166.   Because John Lasky had authority to establish work schedules and/or conditions of employment, provide and direct support regarding human resources issues, including work schedules and/or conditions of employment, and control the drafting and

enforcement of the policies which govern employees' schedules and/or conditions of employment, John Lasky supervised and controlled employees' work schedules and/or conditions of employment.

167.    Because John Lasky had authority with respect to West Penn defendants' centralized records, including a database regarding employees' employment records, John Lasky maintained employees' employment records.

168.    Because John Lasky provided day-to-day support regarding human resources issues, including employees' work schedules and/or conditions of employment, and controls the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, he was affirmatively, directly, and actively involved in operations of West Penn defendants' business functions, particularly in regards to the employment of Plaintiff and Collective Action Members.

169.    Due in part to his role of overseeing human resources, and training and education, John Lasky was actively involved in the creation of the illegal Policy complained of in this case.

170.    Due in part to his role of overseeing human resources, and training and education, John Lasky actively advised defendants' agents on the enforcement of the illegal Policy complained of in this case.

171.    Due in part to his role of overseeing human resources, and training and education, John Lasky actively ensured West Penn defendants' compliance or noncompliance with federal law, including the requirements of the FLSA.

172.    John Lasky was aware that West Penn's Meal Break Deduction Policy permits employees to work during their meal breaks, and that West Penn does not prevent employees

from working during their meal breaks because the needs of the hospital dictate that employees need to be available to work at a moments' notice.

173.    Among other things, John Lasky knew that West Penn does not track the time that employees are working during their meal breaks.

174.    Among other things, John Lasky was aware that West Penn made no effort to determine how often employees are working during their meal breaks.

175.    Among other things, John Lasky was also aware that West Penn made little effort to train employees on what constitutes compensable time and has not conducted any follow up or refresher training with employees to determine whether they were being paid for all the hours that West Penn suffers or permits its employees to work.

176.    Among other things, John Lasky was aware that West Penn's Meal Break Deduction Policy had resulted in widespread failure to compensate employees for the work they do for West Penn during their meal breaks.

177.    Because John Lasky was actively involved in the implementation of the illegal Policy complained of in this case, actively advised the West Penn defendants' agents on the enforcement of the illegal Policy complained of in this case and actively ensured the West Penn defendants' compliance or non-compliance with federal law, including the requirements of the FLSA, John Lasky actively participated in the violations complained of in this action.

178.    Based upon the foregoing, John Lasky is liable to Plaintiff and Collective Action Members because of his active role in operating the business, his role in the violations complained of in this action, his status as an employer, and/or otherwise according to federal law.

**B.    Plaintiffs**

*Named Plaintiff Steven Halle*

179.    At all relevant times, defendants employed named plaintiff Steven Halle ("Plaintiff"). Mr. Halle was employed within this District, and resided within this District.

180.    Mr. Halle was employed at the defendants' Western Pennsylvania Hospital location as a Certified and Licensed Occupational Therapy Assistant in the Rehab Department from approximately 1997 until approximately December 1, 2007.

181.    As a Certified and Licensed Occupational Therapy Assistant for the defendants, Mr. Halle was typically scheduled to work from 7:00am to 7:30 pm, Monday through Friday, totaling 40 hours per week (because of the defendants' meal break deduction policy, Mr. Halle was only paid for 8 hours out of his 8.5 hour shifts). Two workweeks per month, he would work 7:00am to 3:30pm on Saturday and Sunday and in those weeks he would have two days off during the week. In any case, Mr. Halle was scheduled to work at least 40 hours per week. Mr. Halle also worked an extra 8.5 hour shift in approximately 25% of the workweeks that he worked for the defendants.

182.    In addition to the hours listed above, Mr. Halle also worked time for which he did not receive compensation, including during his unpaid meal periods, which were missed or interrupted at least 40% of the time, resulting in .5 hours of unpaid time per shift, totaling approximately 1 hour of unpaid time per week in workweeks where Mr. Halle did not work an extra shift, and approximately 1.5 hours of unpaid time per week in workweeks that Mr. Halle did work an extra shift. During his unpaid meal periods, Mr. Halle performed his regular job duties, including making splints for the burn unit, making outpatient splits, fitting patients for burn or vascular garments, and making splints for the operating room. This

additional time of approximately 1-1.5 hours per week should have been paid at overtime rates.

183.    Mr. Halle timely opted in to the *Kuznyetsov v. West Penn Allgeheny Health System, Inc.*, action and the statute of limitations on his claims has been tolled since that time.

184.    Annexed hereto as Exhibit A is the written consent to filing this complaint duly executed by Plaintiff, pursuant to 29 U.S.C. § 216(b).

### Collective Action Members

185.    As noted above, the Collective Action Members are those employees whom the defendants suffered or permitted to work at least 40 hours in a workweek, and who, during those workweeks, were permitted to work during their unpaid meal periods, but who, because of the defendants' automatic meal break deduction policy, were not paid at the appropriate overtime rate for the time they worked during their unpaid meal periods, during the applicable statute of limitations.

186.    Annexed hereto as Exhibit B are the written consents to filing this complaint duly executed by 185 Collective Action Members, pursuant to 29 U.S.C. § 216(b).

### FACTUAL BACKGROUND

187.    WPAHS is one of the largest health care providers in Western Pennsylvania.

188.    As discussed below, defendants maintained an illegal Meal Break Deduction Policy that denied Plaintiff and Collective Action Members compensation for all hours worked, including applicable premium pay rates.

### Meal Break Deduction Policy

189.    Defendants maintain their Meal Break Deduction Policy throughout their hospitals, centers, and other facilities.

190. Under this policy, the defendants' timekeeping system automatically deducts time from employees' paychecks each shift for an unpaid meal policy.

191. Plaintiff and Collective Action Members are deducted at least 30 minutes from their pay each shift that they work long enough for a meal break. The deduction occurs on every shift to every Plaintiff and Collective Action Member, regardless of their job title, unit, or location.

192. Defendants operate on a 24/7 basis, and in doing so, they do not ensure that Plaintiff and Collective Action Members perform no work during their unpaid meal periods. Further, Defendants actually expect Plaintiffs and Collective Action Members to be available to work throughout their entire shits and consistently require their employees to work during their unpaid meal periods.

193. Plaintiff and Collective Action Members do in fact perform work during those unpaid meal periods and are not paid for that time. During this time, employees continue to perform their regular job duties, including, for example, making splints for the burn unit, making outpatient splits, fitting patients for burn or vascular garments, and making splints for the operating room.

194. Moreover, the defendants know or should have known that the Plaintiff and Collective Action Members perform work during these unpaid meal periods, but still do not pay them for that time, pursuant to their Meal Break Deduction Policy.

195. One of the ways that the defendants are aware of such work being performed is because they permit, and often request, that such work be done by employees during their unpaid meal periods. This work is done on the defendants' premises during operational hours, and in full view of the defendants' managers and supervisors. Thus, the defendants

-31-

permit that such work be done, and they have actual and constructive knowledge that it is performed.

196.    Further, defendants do not prohibit Plaintiff and Collective Action Members from working during their meal breaks and do not have rules against such work.

197.    The defendants also know that employees are receiving assigned tasks that must be completed within appointed deadlines, which results in employees having to work through their unpaid meal periods even though that are not getting paid for such work.

198.    Plaintiff and Collective Action Members are also not relieved by another employee when their break comes, or asked to leave their work location. Further, given the demands of the health care industry and short staffing, defendants' management knew in order to timely complete the tasks they assigned to Plaintiff and Collective Action Members, Plaintiff and Collective Action Members had to work during their unpaid meal periods.

199.    Accordingly, the defendants know or should have known that their employees were working during their unpaid meal periods, but even though they know that such work is being performed, they fail to compensate their employees for such work.

200.    Plaintiff and Collective Action Members are subject to the Meal Break Deduction Policy and are not fully compensated for work they perform during breaks, including, without limitation, hourly employees working at defendants' facilities and centers, such as secretaries, housekeepers, custodians, clerks, registered nurses, licensed practical nurses, nurses aides, administrative assistants, anesthetists, clinicians, medical coders, nurse case managers, nurse interns, nurse practitioners, nurses aides, practice supervisors, professional staff nurses, quality coordinators, resource pool nurses, respiratory therapists, occupational therapists, senior research associates, operating room coordinators, surgical

specialists, admissions officers, student nurse techs, trainers, transcriptionists and other health care workers.

201.    As a result of this policy, Plaintiff and Collective Action Members are entitled to compensation for all time that they performed work for defendants, including during their unpaid meal periods.

202.    As discussed more fully above, this additional uncompensated time should have been paid at overtime rates when Plaintiff's and Collective Action Members' compensated hours were 40 or more in a workweek.

*Additional Allegations*

203.    Plaintiff and Collective Action Members were subject to defendants' time keeping policies which fail to ensure that employees are compensated for all hours worked, including pursuant to the policies described above.

204.    As alleged herein, because of defendants' Unpaid Work Policies, described above, Plaintiff and Collective Action Members regularly worked hours both under and in excess of forty per week and were not paid for all those hours.

205.    As detailed herein, rather than incur additional labor costs by paying non-exempt hourly employees for all the hours they worked, the defendants accepted the services provided by Plaintiff and Collective Action Members and required and permitted Plaintiff and Collective Action Members to work hours under and in excess of forty hours per workweek without receiving any compensation for those hours.

206.    The defendants engaged in such conduct and made such statements to conceal from the Plaintiff and Collective Action Members their rights and to frustrate the vindication of the employees' federal rights.

207.   As a result, employees were unaware of their claims.

208.   The defendants' failure to pay overtime as required by the FLSA is willful.

## FIRST CAUSE OF ACTION
### *FLSA*

209.   Plaintiff and Collective Action Members reallege the above paragraphs as if fully restated herein.

210.   Defendants willfully violated their obligations under the FLSA and are liable to Plaintiffs and Collective Action Members.

**WHEREFORE**, Plaintiffs and Collective Action Members demand judgment against defendants in their favor and that they be given the following relief:

(a)   an award of the value of Plaintiffs' and Collective Action Members unpaid wages;

(b)   liquidated damages under the FLSA equal to the sum of the amount of wages and overtime which were not properly paid to Plaintiffs and Collective Action Members;

(c)   an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Plaintiffs' and Collective Action Members rights;

(d)   an award of pre- and post-judgment interest; and

(e)   such other and further legal or equitable relief as this Court deems to be just and appropriate.

## JURY DEMAND

Plaintiff demands a jury to hear and decide all issues of fact.

Dated: October 4, 2013

**THOMAS & SOLOMON LLP**

By:   /s/ J. Nelson Thomas              
J. Nelson Thomas, Esq. (PA#209852)
Justin M. Cordello, Esq. (PA#209838)
  *Attorneys for Plaintiffs and Collective Action Members*
693 East Avenue
Rochester, New York 14607
Telephone:  (585) 272-0540
nthomas@theemploymentattorneys.com
jcordello@theemploymentattorneys.com